Dani Schwartz, Esq.
Offit Kurman, P.A.
590 Madison Ave., 6th Fl.
New York, New York 10022
Tel: (212) 545-1900
Fax: (212) 545-1656
Email: dani.schwartz@offitkurman.com

Joyce A. Kuhns, Esq.
Offit Kurman, P.A.
1954 Greenspring Drive, Suite 605
Timonium, MD 21093
Tel: (410) 209-6463
Fax: (410) 209-6435
jkuhns@offitkurman.com

*Attorneys for the Estate of Frank Sofia*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------X
IN RE:                                    :
                                          :   CHAPTER 11
                                          :
491 BERGEN ST. CORPORATION, et. al.,¹     :   CASE NO. 25-10091 (DSJ)
                                          :
DEBTORS.                                  :   (JOINTLY ADMINISTERED)
-----------------------------------------------------------X
```

**OBJECTIONS TO FINAL APPROVAL OF DISCLOSURE STATEMENT AND**
**CONFIRMATION OF CHAPTER 11 PLAN OF LIQUIDATION FOR**
**139-141 FRANKLIN ST REALTY CORP. PURSUANT TO**
**CHAPTER 11 OF THE BANKRUPTCY CODE**

The Estate of Frank Sofia (the "**Frank Estate**"), by and through its counsel, submits these

Objections to Final Approval of the Disclosure Statement (the "**Disclosure Statement**") and

Confirmation of Chapter 11 Plan of Liquidation (the "**Liquidation Plan**") for 139-141 Franklin

St. Realty Corp. pursuant to Chapter 11 of the Bankruptcy Code ("**Objections**") and, in support,

states as follows:

---

¹ The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: 491 Bergen St. Corporation (3170); 471 Amsterdam Ave Realty Corp. (2592); T.J.F. Holding Corp. (3169); 139-141 Franklin St. Realty Corp. (9714); Sofia Bros., Inc. (5534); and Peter F. Reilly Storage Inc. (6909). The location of Debtors' principal place of business is 475 Amsterdam Avenue, New York, New York 10024.

## I.    Preliminary Statement

1.    The Frank Estate is the primary–if not sole–creditor of Debtor 139-141 Franklin

St. Realty Corp. ("**Franklin**") (and of all of the Debtors under these jointly administered cases)

pursuant to a final, unappealable $57+ million judgment (the "**Judgment,**" defined below) issued

by New York State Supreme Court. The Frank Estate does not oppose the sale of the Franklin

Debtor's primary asset—the Franklin Property (defined below)—to the proposed buyer in order

to use the sale proceeds to satisfy a portion of the Judgment.

2.    However, the Disclosure Statement and Liquidation Plan contain significant and

troubling deficiencies, including, without limitation:

   a. neither the Disclosure Statement nor the Liquidation Plan recognize the Frank
      Estate's irrefutable status as both a creditor and an equity holder of a one-third
      ownership interest in the Franklin Debtor;

   b. the Liquidation Plan, as described in the Disclosure Statement, provides for the
      treatment of the Frank Estate's Claim in Class 1 based on the Judgment, but fails
      to disclose the exact amount of the Judgment payable to the Frank Estate on
      closing on the sale of the Franklin Property;

   c. the Liquidation Plan, as described in the Disclosure Statement, appears to provide
      that only one-third of the Judgment amount owed to the Frank Estate by the
      Franklin Debtor will be paid on closing, with more than $11 million of sale
      proceeds held in some unidentified account by some unidentified party or
      institution for **ten (10) years**, over which time the fully liquidated Franklin
      Debtor proposes to disburse those funds to the Frank Estate in 120 monthly
      installment payments, plus interest, to satisfy the Judgment. Thus, the
      Liquidation Plan, as described in the Disclosure Statement, inequitably shifts the
      risk of nonpayment and loss to the Frank Estate by deferring its final payment for
      a ten (10) year period after the Franklin Debtor is fully liquidated, while in the
      meantime providing for the disbursement of the residual of net sale proceeds to
      certain equity holders in violation of the absolute priority rule, and needlessly
      requiring this Court's continuing jurisdiction and supervision, and the supervision
      of and payments to the U.S. Trustee, **through the year 2035**;

   d. although the Disclosure Statement and Liquidation Plan disclose that any residual
      funds are payable to the Class 3 equity interests, neither the Disclosure Statement
      nor the Liquidation Plan disclose who the holders of such interests are. However,

the List of Equity Security Holders appended to the Statement of Financial Affairs [ECF No. 7] lists John J. Sofia, Jr. and Leonard Sofia as the sole equity holders, erroneously omitting the one-third interest of the Frank Estate;

e.  the Liquidation Plan impermissibly gerrymanders classes to deny creditors their right to vote to artificially create "deemed" acceptances of the Liquidation Plan; and

f.  the Liquidation Plan impermissibly seeks to elevate the interests of Sofia family insider equity holders over the claims of creditors including its primary creditor, the Frank Estate.

Thus, as more fully explained below, the Disclosure Statement is deficient as it fails to provide "adequate information" to allow a hypothetical investor to make an informed judgment about the Liquidation Plan mandated by Section 1125 of the Bankruptcy Code. Moreover, the Liquidation Plan is non-confirmable as it fails to satisfy all the prerequisites of Section 1129 of the Bankruptcy Code, including failing to provide adequate means for its implementation, failing to set forth appropriate classification of claims and interests, and impermissibly disenfranchising the Frank Estate by characterizing its claim as unimpaired and ignoring its one-third equity interest in the Franklin Debtor (and, in fact, in each of the six [6] Debtors).[2]

## II.    General Background

3.    On January 22, 2025, the Franklin Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code commencing Case No. 25-10094 (DSJ). Five other affiliated debtors filed petitions on the same date. These cases are being jointly administered under Case No. 25-10091 (DSJ).

---

[2] These deficiencies are particularly detrimental and prejudicial to the Frank Estate. Frank Sofia's death in July 2022 when coupled with the six Debtor Corporations' obligations to purchase his shares of stock upon his death, triggered an immediate tax debt to the IRS and the New York State tax authority of more than $11 million, which the Frank Estate cannot pay until the Judgment is satisfied. Thus, the Frank Estate is currently in default of its tax obligations and is at risk of having its tax installment payment plans cancelled, with the imposition of additional penalties. For these reasons, time is truly of the essence for the Frank Estate to receive meaningful amounts toward satisfaction of its $57 million Judgment against the Debtors.

4.      The Franklin has requested and obtained an Order [ECF No. 49 and 52]
conditionally approving its Disclosure Statement and setting a combined hearing for final
approval of its Disclosure Statement and confirmation of its Liquidation Plan for April 29, 2025
at 11:00 a.m.

5.      In the interim, the Frank Estate has filed a Proof of Claim [No. 4-2, Part 4 with
attachments] with respect to its entitlement to certain payments from the Franklin Debtor's
estate, and a Proof of Interest [No. 4-2, Part 10 with attachments] asserting a one-third interest in
the equity of the Franklin Debtor. Copies of the Proof of Claim and Proof of Interest, as-filed, are
attached hereto as **Exhibits ("Ex.") 1 and 2**, respectively.

6.      The basis for the Frank Estate's Claims and interests are more fully set forth in
the respective Proof of Claim and Proof of Interest, which are incorporated herein by reference,
and are summarized below.

**A. Background of Sofia family businesses in relation to the Frank Estate.**

7.      About a century ago, the Sofia family started a self-storage business in New York
City. After the death of Carmela Sofia in 1988, each of her three adult children – brothers Frank
Sofia, John Sofia, and Leonard Sofia – owned one-third of the shares of stock of the following
corporations that collectively constituted the family's self-storage business (each individually, a
"**Corporation**" and collectively, the "**Corporations**"): (i) Franklin (previously defined), the
owner in fee of the real property and self-storage facility located at 139-141 Franklin Avenue in
Manhattan (the "**Franklin Property**"); (ii) 491 Bergen St. Corp. ("**Bergen**"), the owner in fee of
the real property and self-storage facility located at 491 Bergen Street in Brooklyn, New York
(the "**Bergen Property**"); (iii) 471 Amsterdam Ave Realty Corp. ("**Amsterdam**"), the owner in
fee of the real property and self-storage facility located at 471-475 Amsterdam Avenue in
Manhattan (the "**Amsterdam Property**"); (iv) T.J.F. Holding Corp. ("**TJF**"), the owner in fee of

4

the real property and self-storage facility located at 4388-4396 Broadway in Manhattan (the

"**Broadway Property**"); (v)  Sofia Bros, Inc. ("**Sofia Bros**"), which manages and operates the

self-storage facilities owned by Amsterdam, TJF, and Franklin; and (vi) Peter F. Reilly Storage,

Inc. ("**PFRS**"), which manages and operates the self-storage facility owned by Bergen.[3]

**B.  The Corporations' Shareholders' Agreements require each Corporation to purchase the shares of a deceased shareholder's stock.**

8.      As owners and operators of the business, Frank Sofia, John Sofia, and Leonard

Sofia entered into six substantially identical Shareholders' Agreements, one governing each of

the Corporations. The Shareholders' Agreements memorialized the ownership of the shares of

stock in each of the Corporations. The Shareholders' Agreements provide that when a

shareholder dies, each Corporation is obligated to purchase the decedent's shares of stock in the

Corporation in a specified manner, over a specified timeframe, and in an amount calculated

pursuant to a specified price formula. The Shareholders' Agreements also provide that when a

shareholder dies, the surviving shareholders become guarantors of a portion of the purchase price

of the deceased shareholder's shares of stock in the relevant Corporation.

**C.  Frank Sofia dies in 2022, triggering the Corporations' obligations to purchase his shares.**

9.      On July 31, 2022, Frank Sofia died. At the time of his death, he owned one-third of the

shares of stock of each of the Corporations. Although the Shareholders' Agreements obligated the

Corporations to purchase the Frank Estate's shares on Frank Sofia's death, the Corporations failed and

refused to purchase the Frank Estate's shares.

**D.  The Frank Estate commences an arbitration against the Corporations, John Sofia, and Leonard Sofia, which ends with a final award in favor of the Frank Estate totaling more than $57 million.**

---

[3] Prior to her death, Carmela Sofia and her sons each owned a one-quarter interest in Amsterdam, TJF and Sofia Bros. After her death, the brothers, as the sole remaining shareholders, stipulated to a reallocation of her interests in these entities so that each held a one-third interest in these three Corporations. *See* **Ex. 2**, p.1.

10.     In 2023, the Frank Estate sought to compel performance of the share-purchasing

provisions of the Shareholders' Agreements, and commenced an arbitration against the

Corporations, John Sofia, and Leonard Sofia. In September 2024, the arbitrator issued an initial

arbitration award, which he modified in October 2024 (collectively, the "**Award**"). *See* **Exs. 1

and 2** with Award appended thereto.

11.     The Award held the Corporations liable to the Frank Estate in the amount of more

than $57 million. Having heard the testimony of John Sofia and Leonard Sofia, and having

considered all the evidence, the Arbitrator's Award ruled that the Corporations and John and Leonard

Sofia were "disingenuous" in their testimony and arguments (Award, p. 20), that their testimony and

legal positions were "untenable" and were contrived to "destroy the fair meaning of the Shareholder

Agreements" (*id.*, p. 21, 22), and that John Sofia and Leonard Sofia "chose to ignore and

subsequently disavow the terms and conditions of the Shareholder Agreements" because they simply

did not want to pay the Frank Estate what they were required to pay (*id.*, pp. 10-11).

12.     In the arbitration, the Corporations, and John and Leonard Sofia, tried every

conceivable tactic and argument to avoid paying the Frank Estate what it was justly owed. For

example, they testified that the Shareholders' Agreements were terminated, that they were

abandoned, and that they were unenforceable because John and Leonard Sofia did not read or

understand them when they signed them in 1986. The Award flatly rejected all of these claims.

*See ids.*

13.     In determining the amount of each Corporation's liability to the Frank Estate, the

Arbitrator expressly ruled that the Frank Estate would not be obligated to relinquish its stock in

any of the Corporations until it was paid in full by all of the Corporations: "**Upon payment of all

sums granted herein**, [the Frank Estate] is to surrender its stock interest in the respective

Corporations" (*id.*, p. 28) (emphasis supplied).

6

**E. New York State Supreme Court confirms the Award and enters judgment over the Corporations' objections.**

14.    In October 2024, the Frank Estate commenced a special proceeding in New York State Supreme Court to confirm the Award and enter judgment upon it (*Estate of Frank Sofia v 491 Bergen St. Corp., et al.*, Supreme Court, New York County Index No. 655679/2024 [the "**State Court Proceeding**"]).

15.    By order dated November 22, 2024, the New York State Supreme Court confirmed the Award in its entirety. Shortly thereafter, on December 6, 2023, State Supreme Court issued and entered a Judgment in favor of the Frank Estate and against the Corporations, John Sofia, and Leonard Sofia. *See* **Exs. 1 and 2** and Judgment appended thereto. The Judgment essentially mirrors the Award, and provides that the Frank Estate is entitled to payment by the Corporations in the total principal amount of $57,161,982.25 plus interest accruing at the rate 8.5% per annum, of which the principal amount of $57,145,000 is allocated to purchasing the Frank Estate's shares of stock in the Corporations, and $16,982.25 is an award to the Frank Estate of one-half of the Arbitrator's fees and charges.

16.    As is specifically relevant to the Franklin Debtor, the Judgment provides that Franklin is liable to the Frank Estate in the principal amount of $16,667,000, with one-third of that sum, in the amount of $5,555,667, payable to the Frank Estate as a lump sum together with simple interest of 8.5% per annum from September 6, 2023 through the date of payment, and the remaining two-thirds balance of $11,111,333 payable in 120 monthly installments commencing 60 days from the lump sum payment, with the installments bearing simple interest from the date the first installment is due.

17.    The Judgment further expressly provides that the Frank Estate is not required to surrender its stock interest in any of the Corporations until "payment to [the Frank Estate] of all sums required by this judgment," which has not occurred.

7

18.     At all relevant times, including on the Petition Date and continuing to date, the Frank Estate held and continues to hold one-third of the equity interests in each of the Debtors, and continues to do so in accordance with the respective Shareholders' Agreements and the Judgment.[4]

19.     The Judgment is final and not appealable because, as reflected in the Stipulation of Partial Settlement [ECF No. 6], Debtors withdrew with prejudice their notice of appeal of the Judgment in January 2025 (and the time to appeal from the Judgment has now expired).The Frank Estate calculates that the Judgment has accrued interest totaling approximately $2,629,943 through April 25, 2025 (and continuing each day until payment), minus the $345,000 the Debtors have paid thus far. Of that total interest accrual, interest on just the Debtor's adjudicated liability to the Frank Estate totals approximately $769,803 through April 25, 2025. Interest on the Franklin Debtor's liability to the Frank Estate is accruing interest at the approximate rate of $1,293.91 per day.

20.     The *Rooker- Feldman* doctrine precludes federal courts, including bankruptcy courts, from sitting in appellate review of state court judgments (except habeas corpus proceedings). *See Rooker v. Fidelity Trust,* 263 U.S. 413, 44 (1923), and *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 103 (1983). Thus, the bankruptcy court is precluded from modifying state court judgments such as the Judgment, absent the Frank Estate's consent. *See e.g., In re Keenan*, 201 B.R. 263 (266-267) (Bankr. S.D.Cal. 1996) "([The Debtor] wants this Court to substitute its judgment for the judgment already reached by a state court jury and judge.

---

[4] On January 31, 2025, a Stipulation of Partial Settlement [ECF No. 6] was entered in the Bankruptcy Case which, among other things, provided that the Frank Estate would immediately withdraw its restraining notices on Debtors' affected bank accounts and Debtors would immediately pay $300,000.00 to the Frank Estate to be credited against the Judgment. The Frank Estate reserved its right to seek further adequate protection payments. Subsequently, another Stipulation was entered on March 24, 2025, which provided, among other things, that commencing on March 7, 2025 the Debtors would pay $15,000.00 per month on or before the 10th day of the month, to be credited against the Judgment. The Frank Estate continued to reserve its right to seek additional adequate protection, monetary or otherwise, if, as, and when appropriate.

The *Rooker-Feldman* doctrine precludes such a result." (*Id.*) The obstructionist conduct that has
characterized the Debtors' disputes with the Frank Estate must stop here. The Frank Estate is
now before a court of equity, charged with reviewing the Liquidation Plan, to ensure its fair
treatment to creditors, one of the overarching principles of the Bankruptcy Code.

### III.    The Disclosure Statement Fails to Provide Adequate Information Under the Circumstances Here

21.     Under Chapter 11, a disclosure statement must contain "adequate information" to
be approved by the court. 11 U.S.C. § 1125 (b). "Adequate information" is defined by the
Bankruptcy Code in pertinent part to mean:

> Information of a kind, and in sufficient detail, as far as is reasonably
> practicable in light of the nature and history of the debtor and the condition
> of the debtor's books and records ... that would enable ... a hypothetical
> investor of the relevant class to make an informed judgment about the plan
> ... and in determining whether a disclosure statement provides adequate
> information, the court shall consider complexity of the case, the benefit of
> additional information to creditors and other parties-in-interest and the cost
> of providing additional information...

11  U.S.C. § 1125 (a)(1).

22.     A determination of what constitutes adequate information is subjective, must be
made on a case-by-case basis, and is committed to the court's sole discretion. *See Kirk v. Texaco,
Inc.,* 82 B.R. 678, 682 (S.D.N.Y. 1988). *In re Babayoff*, 445 B.R. 64, 78 (Bankr. E.D.N.Y. 2011).

23.     Courts have developed a list of relevant factors to consider in evaluating the
adequacy of a disclosure statement including:

> (1) the events that led to the filing of a bankruptcy petition;
> (2) a description of the available assets and their value;
> (3) the anticipated future of the company;
> (4) the source of information stated in the disclosure statement;
> (5) a disclaimer;
> (6) the present condition of the debtor while in Chapter 11;
> (7) the scheduled claims;
> (8) the estimated return to creditors under a Chapter 7 liquidation;
> (9) the accounting method utilized to produce financial information and the
>       name of the accountants responsible for such information;

9

(10) the future management of the debtor;

(11) the Chapter 11 plan or a summary thereof;

(12) the estimated administrative expenses, including attorneys' and accountants' fees;

(13) the collectibility of accounts receivable;

(14) financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan;

(15) information relevant to the risks posed to creditors under the plan;

(16) the actual or projected realizable value from recovery of preferential or otherwise voidable transfers;

(17) litigation likely to arise in a nonbankruptcy context;

(18) tax attributes of the debtor; and

(19) the relationship of the debtor with affiliates.

*See e.g. In re Metrocraft Publ'g Servs., Inc.*, 39 BR 567, 568 (Bankr. N.D. Ga. 1984). Most of these factors are not relevant here, as the Liquidation Plan essentially provides for an asset sale and distribution of certain net proceeds to the Frank Estate, with the residual payable to equity holders.[5] However, this Disclosure Statement fails to satisfy Factors 2, 12, 13, 15, 16, 18, and 19, which we address below *seriatim*.

### FACTOR 2 – The Disclosure Statement fails to provide a description of the available assets and their value

24.     Because the Liquidation Plan is predicated on a sale of the Franklin Property under Section 363 of the Bankruptcy Code, the Disclosure Statement is deficient as it fails to describe the Franklin Debtor's efforts (if any) to market the property to maximize its value to the Frank Estate. This lack of disclosure is of particular concern to the Frank Estate because its ultimate recovery on account of the Judgment is dependent on the maximization of proceeds from future sales of the properties owned by the Franklin Debtor's affiliates. *See generally*, *Corp. Assets, Inc. v. Paloian*, 368 F.3d 761, 765 (7th Cir. 2004) (stating that in a bankruptcy sale,

---

[5] Apparently, the unsecured creditors listed on Franklin Debtor's Schedules [ECF No. 7] were paid pursuant to an Order Authorizing, but not Directing, the Debtors to Pay Certain Prepetition Claims of Vendors and Service Providers [ECF No. 36].

the "governing principle ... is to secure the highest price for the benefit of the estate and creditors").

25.     Moreover, the Franklin Debtor agreed to a contractual sale price for the Franklin Property in the amount of $43.5 million, but the Award held that the appraised value of the Franklin Property was $50 million as of the date of Frank Sofia's death in July 2022. No explanation was provided for this sizable apparent diminution of value.

26.     The Franklin Debtor's Schedules disclose outstanding accounts receivable as of the Petition Date in the amount of $223,727.50 [ECF No. 7]; however, the Disclosure Statement is silent on the existence and value of this asset. This lack of disclosure is prejudicial to the Frank Estate and will be more fully discussed in connection with Factor 13 below.

### FACTOR 12 – The Disclosure Statement fails to disclose the allocation of estimated administrative expenses, including attorneys' and accountants' fees

27.     The Disclosure Statement fails to disclose how administrative expenses and professional fees under the jointly administered cases will be allocated to the Franklin Debtor's estate. In fact, there is no disclosure of the allocation anywhere in the record of this Bankruptcy Case. *See e.g.* Monthly Operating Reports filed to date at ECF Nos. 70 and 76, which fail to list accruing administrative expenses or professional fees; *see also* First Monthly Statement of Fees and Expenses for Debtors' counsel for the period January 23, 2025 – February 28, 2025 [ECF No. 42] and the Second Monthly Statement of Fees and Expenses for Debtors' counsel for the period March 1, 2025 – March 31, 2025 [ECF No. 81], which are reported on a consolidated basis only. Without this information, and without the requisite disclosure regarding marketing efforts, the Frank Estate cannot determine that the property has been marketed to maximize its value nor appropriately administered to maximize payment to creditors.

11

**FACTOR 13 –**   **The Disclosure Statement fails to set forth the collectability of accounts receivable**

28.      As noted above, the Disclosure Statement is silent on the availability of accounts receivable for potential creditor recovery. The Disclosure Statement merely states at Section V, entitled "General Disposition of Assets" that "the Debtor shall sell or otherwise dispose of, or liquidate to or otherwise convert to Cash, any non-Cash Assets in such manner as the Debtor shall determine is in the best interests of the Estate." However, it fails to disclose the collectability of such receivables and to identify how and by whom they will be liquidated, and to whom the cash proceeds will be distributed and when.

**FACTOR 15 –**   **The Disclosure Statement fails to disclose information relevant to the risks posed to creditors under the Plan**

29.      The Disclosure Statement reflects that the Liquidation Plan provides for an unspecified payment to the Frank Estate from net proceeds of the sale of the Franklin Property at closing, with the balance payable over **a ten-year period**.  While the Judgment may provide for such an extended payout, neither the New York State Supreme Court, in issuing the Judgment—nor the Arbitrator, on whose Award the Judgment is based—ever contemplated that the entity responsible for a long-term payout would be **liquidated a decade** before the balance was satisfied. Thus, the Disclosure Statement fails to address the significant risk of nonpayment to the Frank Estate by such an extended payout where, as here, the Franklin Debtor will be fully liquidated and no disbursing agent or means to guarantee payment of the balance of the Judgment are identified.

30.      We also note that the Disclosure Statement and Liquidation Plan would require this Court to maintain continuing jurisdiction over the Franklin Debtor and its estate until **2035**, would similarly require supervision and periodic payments to the U.S. Trustee's office until 2035, and is

necessarily premised on the fully liquidated Franklin Debtor placing more than $11 million from the net proceeds of the sale of the Franklin Property into some sort of dedicated (but unspecified and unidentified) account and holding that money **for 10 years** to make monthly payments to the Frank Estate while interest accrues on those payments. It is self-evident that such a framework is untenable, impracticable, and not in the best interests of the Franklin Debtor's estate.

### FACTOR 16 – The Disclosure Statement fails to disclose the actual or projected realizable value from recovery of preferential or otherwise voidable transfers

31.     No mention is made whatsoever in the Disclosure Statement of projected realizable value from recovery of avoidable transfers. At the Meeting of Creditors, the attorney for the U.S. Trustee expressly asked the Debtors' representative, Amy Sofia, whether the Debtors paid any bonuses or dividends within two years before the filing of the bankruptcy to directors or officers of the Debtor companies. *See* Section 341 Meeting Transcript, March 14, 2025 ("**Tr.**") at 13:12-14. Ms. Sofia responded that she was not sure. *See* Tr. at 14:3-4. She later confirmed that she would double check. *See* Tr. at 16:20-21. Despite several requests to Debtors' counsel from the Frank Estate's counsel to advise whether dividends or bonuses were paid to directors or officers of the Debtor companies, the Frank Estate's counsel has received no answer to date. It appears that no analysis or investigation has been performed to determine whether there are avoidable transfers that may be recovered for the benefit of the Frank Estate. A copy of the condensed version of the Transcript is attached as **Ex. 3**.

### FACTOR 18 – The Disclosure Statement fails to disclose tax attributes of the Franklin Debtor

32.     Although Franklin Debtor's counsel has indicated orally to counsel for the Frank Estate that the sale of the Franklin Property may result in tax consequences that may require sale proceeds to be reserved, neither the Disclosure Statement nor the Liquidating Plan provide an estimate of such taxes, an explanation for how the tax consequences are to be estimated, a

reserve for such taxes, or an explanation of how or when such taxes must be paid, although any

such payment or reserve may materially impact distributions to the Frank Estate. Furthermore,

the Frank Estate notes that the Franklin Debtor is a New York limited liability company and, as

such, is a "disregarded" entity for tax purposes, which means tax obligations on profits of the

Debtor flow to and are the obligation of its individual members. Thus, to the extent Franklin

Debtor is taking the position that taxes are generated by the sale of the Franklin Property (other

than transfer taxes exempt under 11 U.S.C. § 1146) the Disclosure Statement must offer an

explanation for that position.

**FACTOR 19 –  The Disclosure Statement fails to disclose the relationship of the
Franklin Debtor with affiliates and others**

33.     The Disclosure Statement is also deficient because it fails to disclose that Franklin

Debtor affiliates are co-debtors under the Judgment, and that any delay in paying amounts due to

the Frank Estate will negatively impact the estates and creditors of the Debtor affiliates, as

interest will continue to accrue on the unpaid balance of the Judgment to the detriment of

creditors of the other estates, including the Frank Estate.

34.     The Disclosure Statement is further deficient as it fails to disclose that the

Franklin Debtor apparently disputes that the Frank Estate is a current equity holder. It appears

from the List of Equity Security Holders as discussed at paragraph 1 above, that the Debtors are

taking the position that the Frank Estate is a creditor only under its Judgment, ignoring that the

Frank Estate has not relinquished its stock in the Debtors, and that the Judgment unequivocally

provides that the Frank Estate is not required to surrender its stock interest in any of the Debtors

until the Judgment has been fully satisfied, which has not occurred.

35.     Indeed, the Frank Estate learned for the first time that the Debtors were taking the

position that the Frank Estate was not a shareholder in any of the Corporations when the Debtors

filed their respective Lists of Equity Security Holders with their respective Statements of

14

Financial Affairs. [ECF No. 7 in Case Nos. 25-10091, 25-10092, 25-10093, 25-10094, 25-10095, 25-10096]. The Frank Estate's counsel repeatedly requested that Debtor's counsel explain and substantiate this legal position, which expressly contradicts the Judgment's provision that the Frank Estate is not required to surrender its stock interest in any of the Corporations until "**all** sums required by th[e] judgment**" have been paid in full (emphasis supplied). Debtor's counsel has resisted responding in writing to this request to provide its legal position. However, on a March 26, 2025 telephone call between counsel, Debtor's counsel advised the Frank Estate's counsel that in its view, the Judgment "fixed" the Frank Estate's recoveries against the Debtors and vitiated the Frank Estate's stock and equity interests in the Corporations. To date, Debtor's counsel has not articulated any legal authority supporting its position.

36.     In conclusion, without the requisite disclosures set forth above, it is impossible for the Frank Estate to determine what monies it will recover on account of its Judgment, as well as when it will recover under the Liquidation Plan. Moreover, the Disclosure Statement and Liquidation Plan are premised on the Debtors' erroneous and unsupported legal position that the Frank Estate is not a shareholder.

## IV.     The Liquidation Plan Fails to Satisfy the Prerequisites of Section 1129 (a) of the Bankruptcy Code

37.     To confirm a Chapter 11 plan, the Bankruptcy Court must determine that the Plan satisfies all the required elements of Section 1129 of the Bankruptcy Code. *See  In re Bush Indus., Inc.*, 315 B.R. 292, 296 (Bankr. W.D.N.Y. 2004). Section 1129 (a)(1) requires that a plan must comply with all of the sections of Chapter 11 of the Bankruptcy Code. The Liquidation Plan fail to do so.

**A.  The Liquidation Plan impermissibly classifies and disenfranchises the Frank Estate in derogation of Sections 1124 (1), 1126 (a), and 1126(f) of the Bankruptcy Code.**

38.     Under Section 1126 (a) of the Bankruptcy Code, a holder of a claim or interest can accept or reject a plan. The Frank Estate has filed both a Proof of Claim and a Proof of Interest in this Bankruptcy Case. *See supra* at paragraph 5 and **Exs. 1 and 2** thereto. However, Franklin Debtor has improperly designated all classes under the Liquidation Plan as unimpaired, ostensibly denying the members of each class the right to vote.[6]

39.     A class of claims or interests is impaired under a plan unless the plan leaves unaltered "the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest." *See* 11 U.S.C. § 1124 (1). The Liquidation Plan places the Frank Estate Claim in Class 1 and provides that its claim will be paid essentially in accordance with the Judgment "or as otherwise agreed by the Franklin Debtor and the Frank Estate." *See* Liquidation Plan Article III, Section 3.2. However, no such agreement exists, as Debtor's counsel has rebuffed our attempts to address why the Frank Estate's Claim has been impermissibly and inequitably altered by: (a) claiming that the Frank Estate is no longer a one-third shareholder of the Franklin Debtor, with no legal authority or factual support for Franklin Debtor's contention; and (b) deferring in excess of $11 million of the Frank Estate's $16.6+ million dollar claim over a ten-year period after Franklin Debtor has been fully liquidated. Neither the Arbitrator in issuing the Award, nor the New York State Supreme Court in issuing the Judgment, ever contemplated the situation here, where a judgment debtor will **cease to exist a full decade before the last installment payments are made**. The Frank Estate maintains this change of circumstances under the Liquidation Plan is an alteration of its rights and an impermissible shift to the Judgment creditor of the risk of nonpayment without compensation for the enhanced risk.

---

[6] Under the Liquidation Plan, there are three Classes: Class 1 consists of the Frank Estate Claim; Class 2 consists of the claims of unsecured creditors, of which there appear to be none; Class 3 consists of equity interests.

40.      "[A]ny alteration of a creditor's rights, no matter how minor, constitutes 'impairment.'" *In re Village at Camp Bowie I, L.P.*, 710 F.3d 239, fn. 21 (5th Cir. 2013) (quoting Collier on Bankruptcy, ¶ 1124.03 (16th ed. rev. 2012) ("[a]ny alteration of ... rights constitutes impairment... There is no suggestion that only alterations of a particular kind or degree can constitute impairment."). In *Village at Camp Bowie*, the court found that the unsecured creditors were impaired by debtor's plan which proposed to pay their claims over three months following the plan's effective date where debtor had sufficient cash flow to pay the unsecured creditors' claims upon plan's effective date. Thus, the Liquidation Plan's treatment of the Class 1 claim as unimpaired ignores the requirement of Section 1124 that such claim may only be treated as unimpaired if the rights of the holder are unaltered, which is not the case here,[7] given the protracted payout proposed despite available cash to satisfy the Frank Estate claim in full.

41.      Under Section 1126 (f) of the Bankruptcy Code, the Frank Estate is deemed to accept the Liquidation Plan if its claim is listed as unimpaired. For the reasons stated above, the Class 1 claim of the Frank Estate is impaired and its holder should have been given the right to vote its claim. Instead, the Frank Estate has been impermissibly disenfranchised. Furthermore, the Liquidation Plan ignores the Frank Estate's equity interests in the Franklin Debtor without any legal or factual justification whatsoever and in contravention of the Judgment. *Supra* at paragraph 13.

42.      Equity Interests that are placed in Class 3 are to receive remaining sale proceeds after all fees and administrative expenses are paid. These interests are designated as unimpaired and are therefore deemed to accept the Liquidation Plan under Section 1126 (f). However, it is

---

[7] Furthermore, by permitting distribution of residual sale proceeds to equity holders before paying the Frank Claim in full at closing, the Liquidation Plan violates the absolute priority rule, which is an additional basis to deem the Frank Claim to be impaired. "A creditor is impaired if its treatment violates the absolute priority rule because every creditor has a right to treatment consistent with that principle." *In re Hertz Corp.*, 120 F.4th 1181, 1200 (3d Cir. 2024). For further discussion of the absolute priority rule, *see* Section V. below.

impossible to tell if any dollars will flow to Class 3 holders, as neither the Plan nor Disclosure

Statement provide an estimate for administrative claims allocable solely to the Franklin Debtor's

estate, no estimate for ultimate payments on account of the Frank Estate Claim, and no estimate

for taxes due and to be withheld from net sale proceeds. Once again, it appears that the Frank

Estate was improperly excluded from Class 3 and has been improperly disenfranchised.

**B. The Liquidation Plan impermissibly classifies the Frank Estate claim to
achieve an accepting class under Section 1129 (10).**

43.    To confirm a plan, Section 1129 (10) of the Bankruptcy Code requires that if

there is a class of claims that is unimpaired at least one class of impaired claims has accepted the

Plan, as determined without including the votes of any insider. If Class 1 had been properly

designated as impaired and had been permitted to vote to reject the Plan as written, then the Plan

would be unconfirmable for failure to satisfy the requirements of Section 1129 (10) that at least

one impaired class has accepted the Plan. Thus, it appears that the Franklin Debtor has

improperly classified claims to achieve acceptance of the Plan without permitting any votes,

which is impermissible gerrymandering. Courts have long held that while a debtor has a certain

degree of flexibility in classifying classes, classification cannot be used for the purpose of

manipulating votes. *See In re One Times Square Assocs. Ltd. P'ship*, 165 B.R. 773, 778

(S.D.N.Y. 1994) and cases cited therein.

**C. The Liquidation Plan fails to provide adequate means for its implementation
in violation of Section 1123 (5) of the Bankruptcy Code.**

44.    As noted above, the Liquidation Plan does not provide adequate means for its

implementation as contemplated by 1123 (5) of the Bankruptcy Code. It fails to identify any party to act

as the disbursing agent or to liquidate accounts receivable. It also fails to identify any person or entity

who will hold the balance of ten years' worth of installment payments payable to the Frank Estate after

the lump sum payment is made at closing, all while interest accrues on the installment payments.

18

45.    In short, the Liquidation Plan fails to satisfy the prerequisites of Section 1123(5) of the Bankruptcy Code and as such is unconfirmable.

### V.    The Liquidation Plan is Not Fair and Equitable and Violates The Absolute Priority Rule of Section 1129 of the Bankruptcy Code

46.    Section 10.6 of the Liquidation Plan provides that, in the event there is one impaired accepting class,[8] the Liquidation Plan should be considered to satisfy the fair and equitable standard under 11 U.S.C. § 1129 (b) and may be "crammed down" on any dissenter. While the Frank Estate does not accept that the Liquidation Plan may be crammed down, it maintains that, in any event, the Liquidation Plan fails to satisfy the fair and equitable test.

47.    With respect to a holder in a class of secured claims, such as the Frank Estate Claim in Class 1, 11 U.S.C. § 1129 (b)(2)(A) provides:

> (A) With respect to a class of secured claims, the plan provides—
> (i)
> > (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
> > (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;
>
> (ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

---

[8] Here, presumably, the Franklin Debtor would offer Class 2, consisting of purported unsecured claims, which is deemed to have accepted the Liquidating Plan because unimpaired under Section 1126(f), to be the accepting class even though there are no holders of claims in this class, because these claims have already been paid in full under the critical vendor motion. The creation of Class 2 is another example of impermissible gerrymandering that characterizes the Liquidation Plan. Furthermore, Section 1122 of the Bankruptcy Code requires that classes contain "substantially similar claims." "Claim" is defined at Section 101 (5)(A) as a "right to payment..." or at 101 (5)(B) as a "right to an equitable remedy...". Here, all unsecured claims have been fully satisfied and therefore do not constitute classifiable claims.

(iii) for the realization by such holders of the indubitable
equivalent of such claims.

11 U.S.C. § 1129 (b)(2)(A).

48.    The Frank Estate is undisputedly a secured creditor under Section 506(a) of the

Bankruptcy Code and, as such, is entitled to interest, as set out in the Judgment, pursuant to

Section 506(b), up to the value of its collateral. Here, the purchase price of $43.5 million far

exceeds the amount of the Frank Estate Claim including accrued and accruing interest and

therefore should be paid in full. Thus, as here, where the underlying collateral security is being

sold under a plan, the Frank Estate Claim's treatment to comply with the fair and equitable

standard must satisfy either 11 U.S.C. § 1129 (b)(2)(A) at clause (i)- the lien is retained- or 11

U.S.C. § 1129 (b)(2)(A) at clause (iii)- the holder receives the indubitable equivalent of its

Claim. Here, where the collateral is being sold free and clear of all liens, claims and

encumbrances and, thus, the only remaining collateral will be sale proceeds, the Frank Estate's

full Section 506(b) Claim, including all accrued interest, must be paid from the available cash

proceeds to satisfy the indubitable equivalent standard. But it is not. Instead, the Franklin Debtor

seeks wrongfully and impermissibly to defer payment of the Frank Estate Claim over 10 years

despite holding sufficient cash to pay it, in full, at closing.

49.    The Frank Estate is aware of no case law in which a sale occurs and a lien

attaches to sale proceeds, as here, sufficient to pay a judgment, in full, and a debtor is allowed

unnecessarily to defer payment for 10 years. In fact, courts have specifically held that a 10-year

deferral is neither fair nor equitable. *See, e.g., In re Miami Ctr. Assoc, Ltd*., 144 B. R. 937, 940

(Bankr. S.D.Fla. 1992) (holding 10-year deferral of payments to a secured creditor is too long

and violates the fair and equitable standard). This is especially inequitable where, as here, the

Franklin Debtor is liquidated and funds will be at risk in the hands of an undisclosed, third party.

50.     Furthermore, the Liquidation Plan is unconfirmable under 11 U.S.C. § 1129 (b) as

it violates the absolute priority rule. The absolute priority rule, codified at 11 U.S.C. § 1129

(b)(2)(C), provides that a class of interests may not receive or retain any property on account of

such interest unless senior creditors are paid in full. *See Bank of America Nat'l Trust and Sav.*

*Ass'n. v. 203 N. LaSalle P'ship*, 526 B.R. 434, 435 (1999); *see also Troy Sav. Bank v. Travelers*

*Motor Inn, Inc.*, 215 B.R. 485, 494 (N.D.N.Y. 1997) (holding that the absolute priority rule bars

junior classes of claims and interest from receiving any estate property until all senior classes are

paid in full). The Liquidation Plan provides for a 10-year deferred payout to the Frank Estate, its

sole remaining creditor, while distributing the balance of net sale proceeds, which are anticipated

to be in the tens-of-millions of dollars to John and Leonard Sofia, as equity holders. *See*

Liquidation Plan Art. 4(c). Thus, Franklin Debtor's Liquidation Plan impermissibly seeks to

liquidate the Franklin Debtor's assets and distribute proceeds to equity, a junior class of interests,

before the Frank Estate Claim is paid in full in violation of the absolute priority rule. Hence,

even if the Franklin Debtor had invoked Section 1129 (b)(2) as a basis for confirmation, which it

failed to do in its Liquidation Plan, the Liquidation Plan is unconfirmable as written.

## VI.     The Disclosure Statement and Liquidation Plan May be Modified
## to Satisfy the Bankruptcy Code

49.     If the Franklin Debtor provides a chart showing the distribution of sale proceeds

by amount and category (*i.e.,* closing expenses, commissions, real estate taxes, administrative

expenses), then the most significant deficiencies regarding requisite disclosures would be

substantially cured so that the Frank Estate could determine the amount of funds available for

distribution on account of its Claim and interest. In addition, the Franklin Debtor could make a

simple disclosure regarding how, when and by whom accounts receivable will be liquidated and to whom they would be payable.

50.     The sale of the Franklin Property will generate more than enough funds to pay all taxes, administrative fees, **and the entirety of the Franklin Debtor's Judgment debt** to the Frank Estate ($16,667,000 plus interest) – with significant residual funds remaining. Thus, the Franklin Debtor should be required to fully satisfy its debt to the Frank Estate at the closing of the sale of the Franklin Property, with any residual payable to holders of equity interests including the Frank Estate[9].

## VII.    Conclusion and Reservation of Rights

51.     For the reasons stated, the Court should deny approval of the Disclosure Statement, which describes an unconfirmable plan. *See In re Silberkraus*, 253 B.R. 890, 899 (Bankr. C.D. Cal. 2000), *aff'd*, 336 F.3d 864 (9th Cir. 2003) (finding that courts may deny approval of a disclosure statement describing an unconfirmable plan). The Court should also deny confirmation of the Liquidation Plan, as it fails to satisfy the required elements of Section 1129 of the Bankruptcy Code.

52.     The Frank Estate reserves its right to supplement and respond at the Confirmation Hearing on any Reply by the Franklin Debtor to these Objections.

---

[9] The Frank Estate notes that under Federal Rule of Bankruptcy Procedure 3001(f), its timely filed Proof of Interest constitutes *prima facie* evidence of the validity and amount of its interest.

WHEREFORE, the Estate of Frank Sofia requests that the Court enter an Order: (i)

denying approval of the Disclosure Statement as written; (ii) denying confirmation of the

Liquidation Plan as written; and (iii) granting such other relief as may be just.

Dated: New York, New York
      April 25, 2025

**OFFIT KURMAN, P.A.**

Dani Schwartz, Esq.
590 Madison Ave., 6th Fl.
New York, New York 10022
Tel: (212) 545-1900
Email: dani.schwartz@offitkurman.com
    and
/s/ Joyce A. Kuhns_____
Joyce A. Kuhns, Esq. (admitted pro hac pending)
1954 Greenspring Drive, Suite 605
Timonium, MD 21793
Tel: (410) 209-6400
Email: jkuhns@offitkurman.com

*Attorneys for the Estate of Frank Sofia*